UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

```
SUSAN ANNETTE STORY,              )
                                  )
                  Plaintiff,      )    NO. CV-09-5063-LRS
                                  )
     vs.                          )    ORDER RE DEFENDANT'S
                                  )    MOTIONS
JANET NAPOLITANO,                 )
                                  )
                  Defendant.      )
_____  )
```

BEFORE THE COURT are Defendant's Motions for Summary Judgment, Ct. Recs. 27, 35, filed on September 7, 2010 and September 15, 2010 respectively.  An oral argument was held in Yakima, Washington on January 13, 2011, at which time the Court took the motions under advisement.

**I.    BACKGROUND FACTS AND CLAIMS ALLEGED BY PLAINTIFF**

Plaintiff, a female and non-Mormon, commenced work for the Transportation Security Administration ("TSA") on or about October 27, 2002 as a Supervisory Transportation Security Screener at the Pasco Airport.  From the beginning of Plaintiff's employment with TSA through February, 2005, the majority of promotions at the airport were given to Mormons. As of February, 2005, Plaintiff was the only woman in the chain of command at the Pasco Airport.  As of February, 2005, five of the nine members of the chain of command were Mormon men.  Throughout Plaintiff's employment with

ORDER - 1

TSA, Plaintiff claims she was repeatedly subjected to harassment and discrimination because she was a woman and because she was not a Mormon.  Specifically, over the course of Plaintiff's employment with TSA, she asserts that Mr. Brashear, Mr. Mills (Plaintiff's direct supervisor), and Ms. Peggy Nelson, all Mormons, stated on multiple occasions that they wanted to get rid of her, and that they wanted her fired.

After initial training at Spokane Airport, Plaintiff reported to Pasco Airport and was introduced to two other Screening Supervisors: Robert Mills and Derrick Haney. Plaintiff was immediately advised that she was "not equal" and would be the "low man" on the totem pole and would be working all Holidays. Plaintiff perceived these comments to be based upon her sex, as she was to be the only woman working at the Pasco Airport as a supervisor. Plaintiff also states "it was fine for men to take time off of work when their wives or children were sick, but she was accused of abusing leave when she took time off to take care of her children."

From the beginning of her employment at the Pasco Airport, Plaintiff states Mr. Mills voiced his derogatory opinion regarding women in the work place. Plaintiff also became aware that Mr. Brashear, the Acting Federal Security Director ("AFSD"), had also been making derogatory comments toward her, as a woman.  On or about February, 2003, Mr. Brashear stated to a member of Administration that Plaintiff was "a welfare woman who had no business in this administration and should be home raising her rotten children" and that he wanted Plaintiff fired.

On or about June, 2003, Mr. Mills told Plaintiff that she had

ORDER - 2

missed time at work caring for her children and that maybe she should find a way to stay home with them and get out of the workforce. According to Plaintiff, these comments were directed at Plaintiff's sex, and the fact that she was a single mother, of which Mr. Mills disapproved. On or about July, 2003, Plaintiff was issued a Letter of Counseling from Mr. Brashear based upon information submitted from Mr. Mills alleging insubordination and conduct unbecoming.  In response to the letter of counseling, Plaintiff provided proof to Mr. Brashear that the allegations of Mr. Mills were lies, and Mr. Brashear agreed to remove the allegations from Plaintiff's file.

On or about August 14, 2003, Mr. Mills instructed a Transportation Security Screener (TSS) and a Lead Transportation Security Screener (LTSS) (both of whom were male Mormons) to run the Screening Checkpoint and to oversee Checked Baggage processing. Overseeing both areas, as well as alarm resolutions, was Plaintiff's job as a Supervisor. As Plaintiff ranked above both the TSS and the LTSS, Plaintiff states the apparent demotion was again based upon her sex and religion.

On or about September, 2003, Mr. Mills began a discussion with Plaintiff regarding employment at Pasco Airport and the potential for advancement. Mr. Mills spent approximately thirty minutes explaining the Mormon Religion to Plaintiff and how Mormons were superior as they were more reliable, moral, dependable, trustworthy, committed, and dedicated, and therefore more likely to get promotions than anyone. Plaintiff asked Mr. Mills if he believed that because a person is Mormon, that they were a better person or employee. Mr. Mills confirmed that this

was his belief. Plaintiff expressed her disagreement with Mr.
Mills.

On or about October, 2003, Senior Screening Manager Mike
Isaacs informed Plaintiff, after she asked him about Mr. Mills'
religious discrimination, that she should "let it go" if she knew
what was good for her. Mr. Isaacs suggested that Plaintiff "drink
more" to help her deal with the discrimination.  On or about
October, 2003, Plaintiff was informed that Mr. Mills was speaking
with an LTSS and the Screening Team, indicating that Mr. Brashear
was looking for information to use to have Plaintiff terminated.
The LTSS instructed the Screeners to watch Plaintiff and to report
anything they felt may be useful to either LTSS Hammond, Mr. Mills
or Mr. Brashear. Plaintiff states Mr. Mills and Mr. Brashear's
actions were intended to harass and undermine Plaintiff as she was
a female and was not Mormon. This was not done for any TSA
employee other than Plaintiff. On or about November, 2003,
Plaintiff spoke with Mr. Isaacs regarding talk among screeners
that all the promotions were going to Mormons. Mr. Isaacs
again directed Plaintiff to leave the issue alone if she knew what
was good for her.

On or about February, 2004, Mr. Mills recommended to Mr.
Brashear that Plaintiff be sent to Seattle to work as a screener
in a TDY Program. Plaintiff states this was another attempt by Mr.
Mills to remove Plaintiff from her supervisory position due to the
bias against her as a female and as a non-Mormon.

In April 2004, Mr. Isaacs, at the time a Screening Manager,
placed Plaintiff on a Performance Improvement Plan ("PIP") because

ORDER - 4

of problems with her attendance,[1] her leave abuse, her attitude, and her appearance at work, according to Defendant. Plaintiff disputes the purpose, stating the PIP was discriminatory, intended to harass her and was without merit.  During Plaintiff's entire tenure with TSA, no other employee at the Pasco Airport was issued a PIP.

On or about August, 2004, Mr. Mills printed out a job posting for a Federal Daycare position in Alaska and gave it to Plaintiff. Plaintiff asserts Mr. Mills' action was to harass Plaintiff and was directed at her sex and religion.

On or about December, 2004, TSS Margaret "Pegi" Nelson remarked to STSS Randy Johnson, in front of Plaintiff, that she was excited that he [Johnson] would be rotating to the morning shift. Plaintiff asked Ms. Nelson if Plaintiff had wronged her in some way such that she did not want to work with Plaintiff.  Ms. Nelson told Plaintiff that she hadn't done anything wrong, but that Ms. Nelson preferred working with Mr. Johnson and Mr. Prescott as they enjoyed speaking about their shared religious experiences and the effects their beliefs had on their lives. TSS Nelson, STSS Johnson, and STSS Prescott were all Mormons. Plaintiff was told that Ms. Nelson told multiple TSA employees that she hated Plaintiff and wished that Plaintiff would get fired.  Plaintiff was also told that Mr. Mills (a Mormon), also

---

[1]Plaintiff notes that pursuant to the Office of Personnel Management (OPM), attendance was specifically not something to be included in any performance evaluations or reviews, including a PIP. PIPs are intended to be used solely for areas where an employee is in critical default of their duties.  In the PIP issued to Plaintiff, TSA management included all areas of her conduct and performance whether there was a serious default or not, including Plaintiff's appearance at the job site.

reported that he wished that she would get fired.

On or about December, 2004, Plaintiff was asked to stay on shift and cover for Mr. Johnson as he was invited by Mr. Brashear to go golfing with him as a Christmas Bonus, and coverage for his shift had not been previously arranged. Mr. Brashear approved a leave request for Mr. Johnson on the spot without the required notice.  Plaintiff had previously requested family medical leave to care for her brother upon his release from the hospital, but once granted, the leave was subsequently revoked by Mr. Mills, who required Plaintiff to work a three and one-half hour shift, during which the screening check point was closed for nearly two hours and only two flights departed. Plaintiff states the disparate treatment in granting leave was based upon sex and religion, as Mr. Johnson, Mr. Brashear, and Mr. Mills were all Mormon.

On February 18, 2005, Plaintiff was involved in an alleged security breach[2] at Pasco Airport whereby a passenger was allowed to pass through screening with pliers in his carry-on luggage. On or about February 23, 2005, Michael Brashear, the Acting Federal Security Director at the time, learned of the alleged security breach and directed that a formal internal investigation be conducted.  Plaintiff states she was made the subject of a formal internal investigation for a security incident, unlike the male and Mormon employees were treated in similar situations.

According to Defendant, Michael Isaacs, the then Acting Assistant Federal Security Director, talked to Plaintiff[3] and

---

[2]Plaintiff maintains the event was not a security breach.

[3]Plaintiff maintains Mr. Isaacs did not inform her that an investigation was being conducted.

ORDER - 6

informed her that she would be working away from the airport in
the Administration Office, while an investigation was conducted.
At the beginning of the investigation into the pliers incident,
TSA ordered Plaintiff to report to the administrative offices
without providing any reason or explanation. According to
Plaintiff, she was not only assigned to the Administrative Office,
but was ostracized, as no one was allowed to tell her what was
going on, and no one was allowed to speak with her. Plaintiff had
no duties to perform while assigned to the Administrative Office.
While assigned to the administrative offices, Plaintiff's shift
was changed, including her days off, requiring her to adjust her
home life schedule. Plaintiff states when there were previous
security breaches for the male and/or Mormon employees, there were
no suspensions, reassignments, or seclusion and ostracism[4] ordered
by management. No other employee was removed from the airport
pending an investigation for alleged job performance issues.  Male
and Mormon employees were involved in security breaches or
incidents where they did not have similar actions taken against
them as were taken against Plaintiff.

Andrew Lackey, a TSA Screening Manager and Mormon, after
conducting his own investigation of the alleged security breach,
determined that Plaintiff was at fault because she had allowed the
pliers to pass through security and Plaintiff did not make any

---

[4]Plaintiff reports that Mr. Brashear told Plaintiff that he
understood how she was feeling about being shunned in the office
and acknowledged that it was indeed happening, however there was
nothing he could do about it.

report.[5]  Based on his investigation, Mr. Lackey recommended
Plaintiff be demoted from her position as a Supervisory
Transportation Security Screener.  On March 8, 2005, Robert Mills,
provided Plaintiff with a letter dated March 8, 2005[6] from Mr.
Isaacs, the Acting Assistant Federal Security Director, informing
Plaintiff of a proposed reduction in pay band and pay rate and
moving her to the position of Transportation Security Screener.

Mr. Isaacs later informed Plaintiff that the March 8, 2005
letter was being rescinded and a new letter would be issued.  On
March 17, 2005, Mr. Brashear told Plaintiff that legal counsel
should be getting back to him regarding the proposal and he would
present it to Plaintiff the same or the following day.  On March
17, 2005, Mr. Brashear notified Plaintiff by email that the March
8, 2005 letter was being rescinded and a new letter would be
issued.  On March 17, 2005, Mr. Brashear advised Plaintiff that he
was decertifying her as a supervisor.  On March 17, 2005,
Plaintiff was informed by Mr. Brashear that she was being put on
the schedule to start work as a screener starting Monday, March
21, 2005.  On March 17, 2005, Plaintiff confirmed with Mr.
Brashear that he was in fact denying her request for
administrative leave, demoting her and placing her on the schedule
as a screener.  Mr. Brashear advised Plaintiff that she would have
to work as a screener through the appeals process on the demotion,

---

[5]Plaintiff disputes Defendant's characterization of the
incident and maintains there was no breach and she was not
obligated to make any report or to call a security breach for this
incident.

[6]Plaintiff states that Mr. Brashear prematurely presented the
proposal to Plaintiff, prior to approval by legal, so that the
response period would expire before the new Federal Security
Director, Mr. Conley, took office, replacing Mr. Brashear.

and that could take 6 to 9 months.

On March 17, 2005, Plaintiff visited her mental health counselor, who advised her to see a medical doctor for help with her symptoms. On March 18, 2005, Plaintiff was seen by her doctor and was prescribed Trasodone and Paprxetine.  On March 18, 2005, Plaintiff was sent a work schedule for her position as a Transportation Security Screener and was directed to report for work on Monday, March 21, 2005.  On Monday, March 21, 2005, Plaintiff called in sick, informing Mr. Mills that the recent events had made Plaintiff physically and emotionally ill, and that she would not be able to work.

March 18, 2005 was the last day that Plaintiff reported to work for TSA.[7] After March 18, 2005, Plaintiff claims she was suffering so much emotional distress that she could not return to work, given the way she was being treated, nor could she work anywhere else.  It is Plaintiff's position that March 18, 2005 is the date of her "constructive discharge."

On March 21, 2005, Michael Conley took over as the Federal Security Director at the Pasco Airport. On March 23, 2005, Plaintiff submitted a form CA-1 (Report of Traumatic Injury) to the U.S. Department of Labor, Office of Workers' Compensation Program ("OWCP") and requested a form CA16 for her health care provider to complete.  Plaintiff reported that she would be unable to report to work for an undetermined amount of time.  Plaintiff was told by Ric Anderson in Human Resources that she did not need a CA16. Subsequently, Plaintiff again requested a CA16 from Mr.

---

[7]Plaintiff states she had called in sick for March 21 and 22, 2005.

ORDER - 9

Anderson, who advised her that he could only send one. Plaintiff advised Mr. Anderson that she was seeing both a mental health counselor and a medical doctor. Mr. Anderson told her that the form should go to the one who was requiring payment for continuing treatment. Plaintiff chose the mental health counselor based upon Mr. Anderson's advice.

On or about March 25, 2005, a revised letter was provided to Plaintiff describing a reduction in her pay band and pay rate and suspending her from supervisory duties.  The letter explained that the reduction was because of the February 18, 2005 security breach and the 2004 Performance Improvement Plan.

For the pay period from March 20 to April 2, 2005, Plaintiff was listed as Absent Without Leave (AWOL) on her Time and Labor Report.  Plaintiff's AWOL status was later changed to reflect AWOL on March 21 and 22 only because the Agency received Plaintiff's CA-1 on March 23, 2005 and Plaintiff had no leave approved for those two days.

On or about April 4, 2005, the TSA Office of Civil Rights wrote to Plaintiff's attorney and provided a document entitled "Notice of Rights and Responsibilities" which outlines the right a complainant has in the EEO process, including the right to file a lawsuit within 180 days of an EEO complaint.  On April 27, 2005, Plaintiff had her final interview with Sherry Henry, the EEO counselor.  Plaintiff made no other EEO complaints other than those made during the April 27, 2005 counseling with the EEO counselor and the related May 16, 2005 formal EEO complaint.

On April 27, 2005, Michael Brashear issued Plaintiff a letter of reprimand based on her involvement and response to the alleged

February 18, 2005 security breach.  That letter also informed
Plaintiff that she could grieve the letter or take other action if
she believed the letter was based on illegal discrimination.

On or about May 2, 2005, Plaintiff wrote to Mr. Conley to
inform him that she had not yet been given a release to return to
duty.  On May 16, 2005, Plaintiff submitted her Formal Complaint
of Discrimination (based on sex and/or religion discrimination)
with the EEO office at TSA.  In the formal complaint Plaintiff
advised Defendant that she claimed discrimination and hostile work
environment because of sex and religion. Plaintiff identified Mr.
Mills, Mr. Conley, Mr. Hammond and others in her initial affidavit
in the EEO record of investigation.  Plaintiff specifically
attributed to Mr. Mills discriminatory actions, statements, and
behavior in the record of investigation.  After May 16, 2005,
Plaintiff did not submit any other Formal Complaints of
Discrimination nor did she amend the Formal Complaint of
Discrimination she had provided on May 16, 2005.

On June 1, 2005, the U.S. Department of Labor informed
Plaintiff that her request for continuation of pay based on her
report of on-the-job injury (triggered by the CA-1) was denied for
failure to provide sufficient medical documentation of her alleged
injury.  Following denial of Plaintiff's OWCP claim on June 1,
2005, Ric Anderson of Human Resources went to her home on one
occasion,[8] to tell her that she would have to amend her time card

_____

[8]Defendant states Mr. Anderson was unable to reach her by
phone or mail. Plaintiff states she had been responding to email
during the time period when Mr. Anderson came to her home.
Plaintiff states Mr. Anderson repeatedly knocked on Plaintiff's
front door and rang her doorbell until she answered the door. Mr.
Anderson told Plaintiff that TSA would be taking collection
actions against her and that she should get over the difficulties

to reflect the OWCP denial, which required changing her time from Continuation of Pay to either sick or annual leave. Plaintiff had been responding to email during the time period when Mr. Anderson came to her home.

On July 14, 2005, Michael Conley at TSA wrote to Plaintiff inquiring when she would be returning to work.  Plaintiff responded that she intended to return to work[9] but that medical evidence was not relevant for review and comment by the employer, and thus she would not provide the requested information to TSA. Over the course of several months – between March and November 2005 – several attempts were made by Mr. Brashear and Mr. Conley to determine whether Plaintiff intended to return to work. Plaintiff asserts that although she intended to return to work, she was unable to do so due to her medical condition caused by the discrimination. Plaintiff states that as a result of the treatment of her by TSA, she has suffered a generalized anxiety disorder.

On September 14, 2005, TSA sent two letters to Plaintiff outlining the agency's request that she return to work or provide medical documentation why she could not do so and advising her of several options she should consider.  On or about September 26, 2005, Plaintiff wrote to Mr. Conley providing him with medical documentation that TSA had requested.

---

with one particular person and just get back to work.  Plaintiff states Mr. Anderson's visit to her home caused her intense emotional stress.

[9]Plaintiff's stated intentions to return to work during the remainder of 2005 were part of her hopes of reinstatement upon favorable resolution of her harassment and discrimination claims, resulting in assurances that she would no longer be subjected to harassment and discrimination because of her sex and because she was not Mormon.  Plaintiff claims she intends to return to federal service upon the resolution of her claims.

On or about October 21, 2005, Michael Brashear at TSA wrote to Plaintiff and provided notice that the agency was considering removing her from her position at TSA. On November 4, 2005, Mr. Conley at TSA wrote to Plaintiff and informed her that she was being removed from her position effective November 9, 2005.

On February 14, 2006, Plaintiff requested a Final Agency Decision in response to a letter sent to Plaintiff by TSA outlining the options available upon completion of the investigation into the discrimination complaint. In October 2006, Michael Brashear left TSA because of downsizing in the agency.[10]

On July 31, 2008, Robert Mills passed away. Plaintiff filed the instant action on July 29, 2009. The agency filed a final decision on Plaintiff's discrimination complaint one month <u>after</u> her civil action was filed with this court. In a letter dated August 31, 2009, Steven Shih, Esq., Deputy Officer, and Director for EEO and Diversity Programs, Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security, notified Plaintiff and her counsel of the Department of Homeland Security's final decision dismissing her complaint. Complaint, ¶ 9.

## II.    ANALYSIS

### A. Burden of Proof on Summary Judgment

The summary judgment procedure is a method for promptly disposing of actions. See Fed. R. Civ. Proc. 56. The judgment sought will be granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc 56(c). "[A] moving party without

---

[10]Plaintiff maintains Mr. Brashear was forced to leave TSA because of his treatment of her and the complaint made against him by Leslie Johnson. Johnson Depo., 79:7-11.

ORDER - 13

the ultimate burden of persuasion at trial may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir.2000). If the movant meets its burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In opposing summary judgment, the nonmoving party may not rest on his pleadings. He "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank v. Cities Serv*. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party.

ORDER - 14

*See T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts...." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir.1980).

**B.   Discrimination Based on Sex (Count 1) and Religion (Count 3)**

Defendant asserts that Plaintiff's discrimination claims, Counts 1 & 3 should be dismissed based on several theories, which the court will individually discuss.

**1.   Doctrine of Laches**

First, Defendant argues that the doctrine of laches requires that <u>all</u> claims be dismissed and this Court has discretion to apply laches to the facts.  More specifically, with respect to Counts 1 & 3, Defendant asserts that Plaintiff's civil complaint alleges most of the discriminatory conduct and statements were performed by Screening Manager Robert Mills starting October 2002 when Plaintiff began working for TSA.  Mr. Mills died on July 31, 2008, prior to the filing this lawsuit.  Thus, defense states it has no ability to counter the allegations regarding Mr. Mills and no ability to defend these discrimination claims.  In conclusion, Defendant asserts that the case should be dismissed on the basis of laches because Plaintiff's civil complaint alleges discriminatory conduct and statements by Robert Mills starting in October 2002 and Mr. Mills passed away in 2008.  According to Defendant, Plaintiff unreasonably delayed filing the instant action, as Plaintiff could have filed her civil suit 180 days after filing her EEO Complaint, if no appeal was taken and the

ORDER - 15

1   agency had not made a final decision.

2       The Court does not agree with Defendant.  The operative word
3   is that Plaintiff "could" have filed her civil suit 180 days after
4   the EEO Complaint. The Court agrees that an employer may raise a
5   laches defense if a plaintiff unreasonably delays in filing and as
6   a result harms the defendant.  *Couveau v. American Airlines, Inc*.,
7   218 F.3d 1078, 1083 (9th Cir.2000).  However, in the instant case,
8   the Court does not find that laches applies under the facts before
9   the Court.  It is clear that Plaintiff never abandoned her claim,
10  Plaintiff monitored her claim, and Plaintiff was entitled to take
11  advantage of the administrative process rather than to abandon it
12  to commence a civil suit.  There was no unreasonable delay by
13  Plaintiff.  Further, it would appear both parties are prejudiced
14  by Mr. Mills' death.

15      Plaintiff had multiple options upon the completion of the
16  agency investigation. One of the options included a request for a
17  final agency decision from DHS, which is what she did.  Pursuant
18  to 42 U.S.C. §2000e-16(c), Plaintiff would have had ninety (90)
19  days from receipt of notice of final action taken by TSA to file
20  her civil suit. The matter was submitted to the TSA for a final
21  agency decision on or about February 14, 2006. Complaint, ¶ 8.
22  Under federal regulations, TSA had sixty (60) days to issue a
23  final decision.

24              The agency shall issue the final decision
                within 60 days of receiving notification that
25              a complainant has requested an immediate
                decision from the agency . . .
26
27  29 C.F.R §1614.110(b). Upon inquiry to the TSA (the actual office
    to make the final decision was the Office of Civil Rights of the
28  Department of Homeland Security), Plaintiff was advised that there

ORDER - 16

was a backlog of cases, that they were working on processing cases, and that a decision might be made the following month. Plaintiff elected to wait for the agency to process her request for a final decision. On multiple occasions, the Office of Civil Rights indicated a distinct possibility that Plaintiff"s complaint would be that month, with a decision to be issued within sixty (60) days of the date of inquiry.

Despite a requirement that Defendant process the request for a final decision within sixty (60) days, and the further ability to force Plaintiff to file a civil suit within ninety (90) days from the issuance of a final decision, Defendant never filed a final decision until a month after Plaintiff's civil suit was commenced. While Plaintiff had the <u>option</u> to file a civil suit prior to when she did, Defendant had the <u>requirement</u> to issue a final agency decision and the power to force the filing of any civil suit within ninety (90) days from issuing its decision. Defendant effectively could have controlled the timing of the filing of any civil suit Plaintiff chose to bring simply by issuing a final order.  Defendant did not do so.  The Court finds that the doctrine of laches does not apply under the facts before it.

### 2.    Failure to Exhaust Administrative Remedies

Defendant argues that comparing the allegations in Plaintiff's EEO Complaint and this civil complaint reveals that none of the allegations in paragraphs 12-40 of the civil complaint appear in the EEO complaint.  Defendant argues that a Title VII complainant must initiate contact with an EEO counselor within 45 days of a discriminatory act, therefore, any alleged

discriminatory act outside of the 45-day window is time-barred. Defendant argues it is undisputed that Plaintiff never made any other EEO complaint or saw an EEO counselor regarding alleged acts that took place from 2002 to April 27, 2005.  Defense argues based on the 45-day window requirement, Plaintiff failed to exhaust her administrative remedies with respect to any alleged acts that took place from October 2002 to January 10, 2005.

Defendant further argues, citing *Lyons v. England*, 307 F.3d 1092, 1099 (9th Cir.2002) and *Johnson v. U.S. Treasury Dept.*, 27 F.3d 415, 416 (9th Cir.1994), that failure to comply with this administrative requirement is fatal to a discrimination claim.

Plaintiff responds that Defendant misapplies federal law. Plaintiff argues that all her discrimination claims can be reasonably expected to follow the allegation of sex and religion discrimination made in the initial counseling, the final counseling, and the formal complaint, including the retaliation claim, the hostile work environment claim and the constructive discharge claim.

**A. Allegations Not Specified in the EEO Charge**

To establish federal subject matter jurisdiction, a plaintiff is required to exhaust his or her administrative remedies before seeking adjudication of a Title VII claim.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir.2002).  Therefore incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge.  *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir.1984), *cert. denied*, 469 U.S.

1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985)).

Plaintiff's administrative complaint was with the Equal Employment Opportunity ("EEO") Office for Civil Rights and Civil Liberties within the U.S. Department of Homeland Security, which the Court will analogize to the Equal Employment Opportunity Commission("EEOC").  Under U.S. Equal Employment Opportunity Commission, 29 C.F.R. Part 1614, TSA employees must follow a complaint filing procedure and mandatory time lines.

29 C.F.R. Part 1614.105(a)(1) mandates that the complainant initiate contact with an EEO counselor within 45 days of a discriminatory act.  Part 1614.105(a)(1) reads:

> (a) Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
>
> (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.
>
> (2) The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(1).

1    Under the U.S. Supreme Court's formulation in *National*

2  *Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the

3  continuing violations doctrine is applicable to Title VII claims

4  of hostile work environment, but not to claims of discrimination

5  or retaliation. Under Title VII, discriminatory or retaliatory

6  acts such as termination, failure to promote, denial of transfer,

7  or refusal to hire are "discrete acts" that start a new clock for

8  filing administrative charges alleging that act. *Id.* at 113-14,

9  122 S.Ct. 2061. Such discrete conduct is not actionable unless it

10  occurs within the statutory time period.[11]   *Id.*

11    In the Ninth Circuit, the continuing violations doctrine is

12  applicable to hostile work environment claims involving related

13  acts that collectively constitute a single unlawful employment

14  practice, but inapplicable to claims for discrete acts of

15  discrimination and retaliation. See *Carpinteria Valley Farms, Ltd.*

16  *v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir.2003)

17  (applying *Morgan* timeliness standards to section 1983 claim and

18  discussing the continuing violations doctrine).

19
20  **B.    Discrete Acts of Discrimination Between October 2002 to January 10, 2005**

21    This Court finds that the discrete discriminatory acts in

22  paragraphs 12-40 of Plaintiff's civil complaint, to the extent the

23  evidence is otherwise admissible, may only come in as background

24  evidence in support of Plaintiff's timely (exhausted)

25  ————————————

26    [11]Prior, time-barred acts may not form the basis for liability, but may nevertheless be admissible as background

27  evidence in support of a timely claim. *Morgan*, 122 S.Ct. at 2072. Whether prior acts are admissible as background evidence is

28  governed by the Federal Rules of Evidence, not by whether the prior acts are "reasonably" or "sufficiently" related. *Lyons v. England*, 307 F.3d 1092, 1109-11 (9th Cir.2002).

discrimination claims.[12]   Defendant's motion for summary judgment
is granted in part with respect to the time-barred allegations of
discrimination in Counts 1 & 3, but denied in all other respects
as described elsewhere in this opinion.

**3.   Failure to Meet Elements of A Discrimination Claim**

In the Second Motion for Summary Judgment, Defendant concedes
that certain time-barred allegations may survive its First Motion
for Summary Judgment because of being timely raised in Plaintiff's
EEO action (see Footnote 12).   Defendant urges, however, that
Plaintiff has no direct or circumstantial evidence to support a
*prima facie* case of disparate treatment (discrimination claims).
Specifically, Defendant asserts that Plaintiff suffered no
"adverse employment action" and the agency had a legitimate
nondiscrimination reason to take actions related to the [alleged]
security breach.

Plaintiff argues that she was constructively discharged and
this amounts to an adverse employment action.   Further Plaintiff
states she has presented enough evidence thus far to indicate
there is at least a question of fact as to whether she was
constructively discharged. Plaintiff concludes that she has
presented evidence of a prima facie case of disparate treatment
sufficient to create a genuine issue of fact for trial.

"A person suffers disparate treatment in his employment when

_____

[12]In Defendant's memorandum in support of its Second Summary
Judgment Motion, Ct. Rec. 36, Defendant appears to concede that
the following allegations were presented in her EEO claim:
a. Mar. 2005 – Brashear's suspension of Plaintiff and proposed
demotion of Plaintiff for breach (¶¶ 42-43);
b. Mar. 2005 – Temporary reassignment to Administration (¶ 42);
c. Mar. 2005 – Plaintiff listed as AWOL by Brashear (¶ 47); and
d. Mar. – Oct. 2005 – Anderson interfered with Plaintiff's OWCP
claim (¶ 48).

he or she is singled out and treated less favorably than others similarly situated on account of race" or another protected characteristic. *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 (9th Cir.2006). In order to prevail on a claim of discrimination based on disparate treatment, a plaintiff must first establish a prima facie case that gives rise to an inference of unlawful discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, then the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination. *McDonnell Douglas v. Green*, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.2003).

In order to establish a prima facie case of discriminatory termination through indirect evidence, an employee must show that:

(1) she belongs in a protected class;

(2) she was discharged;

(3) she was doing satisfactory work when the termination decision was

made; and

(4) she was replaced by someone not in the protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Chen v. State,* 86 Wn.App. 183, 189, 937 P.2d 612, *review denied*, 133 Wn.2d 1020 (1997). At summary judgment, the degree of proof necessary to establish a prima facie case [of discrimination] is "minimal and does not even need to rise to the level of a preponderance of the

ORDER - 22

evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) *(quoting Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)).

The determination whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact. *See Lojek v. Thomas*, 716 F.2d 675, 677, 680 (9th Cir.1983).  In the instant case, there is also a question as to whether Plaintiff really resigned or quit on her own or constructively.  A plaintiff alleging a constructive discharge must show some "'aggravating factors,' such as a 'continuous pattern of discriminatory treatment.'" *Satterwhite v. Smith*, 744 F.2d 1380, 1382 (9th Cir.1984). The Ninth Circuit has upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years. *See Wakefield v. NLRB*, 779 F.2d 1437, 1439 (9th Cir.1986); *Satterwhite*, 744 F.2d at 1383. Similarly, in *Nolan*, the Ninth Circuit held that a showing of four incidents of differential treatment over a period of two years was sufficient to create a genuine issue of fact for trial. *Nolan v. Cleland*, 686 F.2d 806, 813-14 (9th Cir. 1982).

The Court finds that there is a genuine issue of material fact with respect to Plaintiff's timely discrimination claims (Counts 1 & 3).  In particular there is an issue of material fact pertaining to whether Plaintiff suffered an adverse employment action, was constructively discharged, and whether gender/religion was a motivating factor in any such employment action.  Under the

mixed-motive[13] method of proof, the plaintiff may avoid summary judgment by introducing sufficient direct or circumstantial evidence that [gender and/or religion] was "a motivating factor" in the employment decision, not necessarily the sole factor. *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)(discussing mixed-motives theory of liability under Title VII).

In conclusion, with respect to Counts 1 and 3, summary judgment is denied in part and granted in part.  Plaintiff has introduced sufficient direct and circumstantial evidence of alleged discrimination to withstand a summary judgment.  The allegations in paragraphs 12-40 of the Complaint are found to be time-barred for failure to exhaust administrative remedies for purposes of the discrimination claims. However, alleged acts in paragraphs 12-40 if otherwise admissible, may be relevant as "background" and can be considered by the trier of fact in assessing the defendant's liability for Plaintiff's claims that she was discriminated against.

**C.   Hostile Work Environment Claim (Counts 2 & 4)**

Again, Defendant sets forth several theories as to why Plaintiff's hostile work environment claim should be dismissed.

**1.  Doctrine of Laches**

For the reasons stated above, the Court finds that the doctrine of laches is not applicable to the facts in this case.

/ / /

---

[13] In a "mixed motive" case, the plaintiff alleges that a discriminatory factor appears to be one of the considerations motivating the adverse employment action. In a "single motive" case, the plaintiff alleges that it was the only reason for the action.

## 2.    Failure to Exhaust Administrative Remedies

Defense again argues that Plaintiff has failed to exhaust her administrative remedies with respect to her hostile work environment claim.  Plaintiff responds that the hostile work environment allegations are reasonably related to the allegations contained in Plaintiff's EEO complaint.

The Court agrees with Plaintiff.  Under the *Morgan* case, the Supreme Court held that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period. The application of equitable doctrines, however, may either limit or toll the time period within which an employee must file a charge.  *Morgan*, 536 U.S. 101 at 105.  The Court has discussed above the inapplicability of the laches doctrine to the facts peculiar to this case.

The *Morgan* court explained that:

> Hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the "unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295. Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*, at 23, 114 S.Ct. 367.

*Morgan*, 536 U.S. 101 at 103.

With respect to Plaintiff's Title VII hostile work environment claims, this Court may consider the entire scope of alleged unlawful behavior, including behavior outside the 45-day time period, provided that all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. *Id*. at 116-17, 122, 122 S.Ct. 2061. Liability may be assessed and damages may be recovered for the <u>entire</u> scope of the hostile work environment.  *Id*. at 119, 122 S.Ct. 2061.

The Supreme Court in *Morgan*, however, did not discuss at length how a court is to determine whether acts about which an employee complains are part of the "same actionable hostile work environment practice." *Id*. at 120, 122 S.Ct. 2061.  The Supreme Court, however, noted that the Ninth Circuit, from which the Morgan case was appealed, considered whether the pre- and post-limitations incidents were "sufficiently" related--for example, where they "involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers"-and were not "isolated, sporadic, or discrete." *Id*. at 107, 120, 122 S.Ct. 2061 (*citing Morgan v. National Railroad Passenger Corp*., 232 F.3d 1008, 1015-16, 1017 (9th Cir.2000)).

Based on *Morgan*, this Court finds that the allegations thought to be time-barred by Defendant, are sufficiently related based on Plaintiff's allegation in her EEO charge (Allegations 3 and 4) that she had been subjected to <u>ongoing</u> discrimination in the form of a hostile work environment because she was a woman and

not Mormon. Plaintiff's EEO charge expressly alleged a "pattern
and practice" of gender and religion discrimination, indicating an
allegation of a continuing violation.  Indeed, Plaintiff's charge
alleged a course of discrimination that had been felt for a very
long time:

> I have felt for a very long time that gender
> and religion discrimination takes place at my
> place of employment.  During the years there
> has been much evidence of this in that Mormon
> males have received preferential treatment in
> promotion (Mr. Mills being promoted to manager
> in March 2003 without being qualified and
> without competition as example) and in many
> other ways. . . .

Ct. Rec. 51-7, Exh. F-1.

Further, Plaintiff noted that the claim accepted by the
Agency for purposes of her EEO charge was framed as follows:

> Whether or not based on religion (Christian,
> non-Mormon) and sex (female), the Complainant
> was discriminated against when she was
> subjected to a hostile work environment while
> employed as a supervisory Transportation
> Security Screener, SV-0019-G at the Tri-Cities
> Airport, Pasco, WA.

Id.

The Court finds that Plaintiff, who became a Supervisory
Transportation Security Screener on October 27, 2002, has alleged
a continuing violation theory specifically in her EEO charge. To
demand that Title VII claimants allege more than Plaintiff did in
her charge to assure eventual federal court jurisdiction "'would
falsify the [Civil Rights] Act's hopes and ambitions'" of
providing a process lay people can use effectively to resolve
discrimination complaints. *Chung v. Pomona Valley Community
Hosp.*, 667 F.2d 788, 790 (9th Cir.1982) (citations omitted)

ORDER - 27

(denial of promotion occurring after filing of EEOC charge may be adjudicated along with other Title VII claims).

Therefore, in this case, Plaintiff's allegation of a continuing violation in her EEO charge is sufficient for federal court jurisdiction.  All of Plaintiff's allegations of hostile work environment are sufficiently related on their face, making dismissal based on lack of subject matter jurisdiction at this stage of the proceedings, improper.

### 3.    Failure to Meet the Elements of Hostile Work Environment Claim

Defendant argues that Plaintiff's hostile work environment claim should be summarily dismissed because Plaintiff is unable to show that she suffered a tangible employment action.

Plaintiff responds that she has shown enough to raise a genuine issue of material fact to defeat summary judgment on this claim.  Plaintiff argues that this Court cannot determine, as a matter of law, that she was not subjected to extreme conduct that altered the terms of her employment.

An employer is liable for conduct giving rise to a hostile work environment if the employee can show: (1) she was subjected to verbal or physical conduct of a harassing nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an intimidating, hostile, offensive, or abusive working environment.  *Nichols v. Azteca Rest. Enter., Inc.,* 256 F.3d 864, 871 (9th Cir.2001)*; Pavon v. Swift Transp. Co.,* 192 F.3d 902, 908 (9th Cir.1999). In addition, the working environment must be both objectively hostile, as perceived by a

ORDER - 28

reasonable person, and subjectively hostile, as perceived by the plaintiff herself. *Nichols*, at 872-73 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Factors that may be considered "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Court cannot say that the environment alleged by Plaintiff would not have unreasonably interfered with her work performance of a reasonable woman, nor that a reasonable woman would not have found that the environment was hostile or offensive.  The Court finds that Plaintiff has presented sufficient evidence to survive a summary judgment motion. Defendant has not successfully disproved any of Plaintiff's hostile work environment allegations. Accordingly, there are material issues of fact which preclude an entry of summary judgment for Defendant.  Summary judgment is denied as to Plaintiff's hostile work environment claim and none of the allegations will be considered time-barred.

**D.    Retaliation Claim (Count 5)**

Defendant argues that Plaintiff's retaliation claim should be dismissed based on multiple theories.

**1.  Doctrine of Laches**

For the reasons stated above, the Court finds that the doctrine of laches is not applicable to the facts in this case.

ORDER - 29

**2.   Failure to Exhaust Administrative Remedies**

Defendant again asserts that Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claim as she did not raise the matter in her EEO complaint. Therefore, Defendant argues, this claim is barred.

The Court finds that the only acts occurring after Plaintiff made her EEO complaint (May 16, 2005) can be considered for purposes of her retaliation claim. The complaint alleges two retaliatory acts: (1) reporting her as AWOL (Compl., ¶ 47) and (2) Anderson's alleged interference with her OWCP claim (Compl., ¶ 48). Plaintiff failed to exhaust her administrative remedies with respect to any alleged acts that took place from October 2002 to January 10, 2005.

**3.   Failure to Meet Elements of Retaliation Claim**

To prove retaliation, Plaintiff must prove (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link between the protected activity and the adverse employment action. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008).

Defendant argues that Plaintiff's retaliation claim fails because the only protected activity in which she took part was filing the EEO complaint on May 16, 2005. The complaint alleges no other participation in a protected activity. Therefore, only acts occurring after Plaintiff made her EEO complaint (May 16, 2005) could ever be considered retaliation. The complaint alleged two retaliatory acts: (1) reporting her as AWOL (Complaint, ¶ 47) and (2) Anderson's alleged interference with her OWCP claim (Complaint, ¶ 48). Defendant contends that neither of the actions

that Plaintiff cites as retaliatory amount to an adverse
employment action.

Defendant further argues that assuming *arguendo* that
Plaintiff articulated a *prima facie* case of retaliation, the
Defendant has shown it had a legitimate, nonretaliatory reason for
its actions.  In particular, Defendant asserts that TSA had a
legitimate, nonretaliatory reason for suspending Plaintiff from
her supervisory duties, proposing a reduction in position and pay,
reassigning Plaintiff, listing Plaintiff as AWOL, and Mr.
Anderson's assistance and visit to Plaintiff's home. These
legitimate, nondiscriminatory reasons, Defendant concludes,
negate any retaliation claim.

The Court finds, and parties do not appear to dispute, that
Plaintiff did engage in protected activity, i.e., making her EEO
complaint on May 16, 2005.  The Court further finds that only two
alleged retaliatory acts will be considered administratively
exhausted with respect to the retaliation claim: (1) reporting her
as AWOL (Complaint, ¶ 47) and (2) Anderson's alleged interference
with her OWCP claim (Complaint, ¶ 48).  Based on the Court's
finding above, however, there is a genuine issue of material fact
as to whether Plaintiff suffered an adverse employment action,
which precludes entry of summary judgment for Defendant on the
administratively exhausted portions of Plaintiff's retaliation
claim.  Summary judgment is granted in part and denied in part as
to Plaintiff's retaliation claim.  It is granted as to the
administrative exhaustion theory and denied based on finding that
a genuine issue of material fact exists as to one or more of the
elements of a retaliation claim.

**E.    Constructive Discharge Claim (Claim 6)**

Defendant argues that Plaintiff's constructive discharge claim should be dismissed based on multiple theories.

**1.  Doctrine of Laches**

For the reasons stated above, the Court finds that the doctrine of laches is not applicable to the facts in this case.

**2.    Failure to Exhaust Administrative Remedies**

Defendant again asserts that Plaintiff failed to exhaust her administrative remedies with respect to her constructive discharge claim as she did not raise the matter in her EEO complaint. Therefore, Defendant argues, this claim is barred.

The Court finds that Plaintiff's purported constructive discharge date of March 18, 2005 does not render this claim time-barred.

**3.    Failure to Meet Elements of Constructive Discharge Claim**

A constructive discharge occurs when a person quits her job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable. *Draper v. Coeur Rochester, Inc.* 147 F.3d 1104, 1110 (9th Cir.1998).

Defendant argues that Plaintiff does not have a viable constructive discharge claim because an employer's legitimate, nondiscriminatory reason for taking actions can negate a constructive discharge claim. Defendant again argues that the Agency had a legitimate, nondiscriminatory reason for the actions it took.

As the Court explains above, there is a genuine issue of

material fact as to whether Plaintiff was constructively
discharged on March 18, 2005.  Defendant's position, in its first
summary judgment motion, is that Plaintiff never quit her job and
therefore there was no constructive discharge.  Defendant's
position slightly shifts in its second motion for summary
judgment, however, to a view that Plaintiff was eventually
terminated because she was not able to perform the duties of the
job. Plaintiff, on the other hand, maintains that the conditions
of employment had become intolerable which prevented her from
reporting to work as a demoted screener. This dispute precludes
entry of summary judgment for Defendant on this claim.  Summary
judgment is therefore denied as to Plaintiff's constructive
discharge claim.

**F.   Damages**

Defendant argues, in its second summary judgment motion, that
Plaintiff's potential damages must be denied completely or limited
in part.  Plaintiff responds that there remains an issue of fact
as to whether or not Plaintiff was unable to work or to return to
work and therefore whether Plaintiff is entitled to any damages,
including back pay. For these reasons, Plaintiff urges the Court
to deny Defendant's request for summary judgment on the topic of
damages.

The Court finds that the aspect of Defendant's motion for
summary judgment to deny or limit Plaintiff's damages is denied as
premature.

**IT IS HEREBY, ORDERED, ADJUDGED AND DECREED** that:

1.  Defendant's Motion for Summary Judgment, **Ct. Rec. 27,**
filed on September 7, 2010, is **DENIED in part and GRANTED in part.**

In sum, the court grants in part and denies in part defendant's summary judgment motion with respect to the discrimination and retaliation claims asserted under Title VII. Defendant's motion, although generally denied, is granted insofar as plaintiff's discrimination and retaliation claims are based on some conduct that falls outside the statute of limitations and is not part of a continuing course of alleged unlawful conduct, i.e. the alleged acts occurring in paragraph 12-40 of Plaintiff's Complaint. As for the hostile work environment claim, all acts alleged are considered part of a continuing course of alleged unlawful conduct.

    2.   Defendant's Motion for Summary Judgment, **Ct. Rec. 35**, filed on September 15, 2010, is **DENIED.**

    The District Court Executive is directed to file this Order and provide copies to counsel.

    **DATED** this 11th day of February, 2011.

*s/Lonny R. Suko*

_____
LONNY R. SUKO
UNITED STATES DISTRICT JUDGE

ORDER – 34